THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7               UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
8                       AT SEATTLE

9    SVEN GOLDMANIS, *et al.*,                    CASE NO. C13-2035-JCC

10                        Plaintiffs,             ORDER

11              v.

12   JOHN INSINGER, *et al.*,

13                        Defendants.

14

15        This matter comes before the Court on Plaintiffs' motion disqualify Defendants' counsel

16   (Dkt. No. 38), Plaintiff's motion to direct Defendants to Dismiss Idaho Case (Dkt. No. 18), the

17   Insinger Defendants' motion for summary judgment (Dkt. No. 20), and Defendant Theresa

18   Pulliam's motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) (Dkt. No. 13).

19   Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral

20   argument unnecessary and hereby DENIES Plaintiffs' motions to disqualify Defendants' counsel

21   and to direct Defendants to Dismiss Idaho Case (Dkt. Nos. 18, 38); GRANTS Defendants'

22   motion for summary judgment IN PART (Dkt. No. 20) and DECLINES to exercise jurisdiction

23   over Plaintiffs' state law claims; and DENIES Defendant Theresa Pulliam's motion to dismiss as

24   moot (Dkt. No. 13).

25   //

26   //

# I.      BACKGROUND

This lawsuit involves a long-running dispute amongst current and former members of Insinger-24, LLC, a family-run business that exists solely to hold and lease a piece of real estate in Bothell, Washington. The LLC was originally formed by Robert Insinger, whose children, along with their spouses, were made members of the company at various points. Plaintiff Linda Insinger was married to Defendant F. Robert Insinger, III ("Rob Insinger") and previously held an interest in the LLC; Plaintiff Sven Goldmanis was married to Elizabeth Insinger and also held an interest in the LLC. Linda ultimately divorced from Rob and Sven divorced from Elizabeth. Since 2004, the parties have been engaged in extensive litigation in Idaho, California, and Washington state courts about their respective interests in the LLC. The thrust of this long-running dispute involves alleged financial harm to Plaintiffs Linda Insinger and Sven Goldmanis caused by Defendants' operation and management of Insinger-24, LLC between 2003 and 2007. In this latest lawsuit, Plaintiffs Linda Insinger and Sven Goldmanis bring a federal RICO claim and twenty additional state-law claims that pertain to the conduct of the LLC and its remaining members. They name as defendants Rob, John, Susan, and Elizabeth Insinger; Insinger-24, LLC; Hollis Seim, a neighbor and alleged co-conspirator; Risch Goss Insinger & Gustavel, John Insinger's law firm; the Virginia Hayes Testamentary Trust; and Theresa Pulliam, an accountant who performed work on behalf of the LLC. (Dkt. No. 10.)

## A.      The Dissociation Scheme

Plaintiffs allege that beginning in 2003, the "Insinger Defendants"—Rob, John, Susan, and Elizabeth Insinger—engaged in a fraudulent scheme to dissociate them from the LLC. To do so, Defendants allegedly tricked Linda into agreeing, with other LLC members, to amend the LLC Operating Agreement in 2004. The amended Operating Agreement authorized the LLC to require members to personally pay "deficit contributions"—*i.e.*, payments to help the LLC meet its debt obligations. Plaintiffs allege that the Insinger Defendants sought these amendments knowing that Linda Insinger and Sven Goldmanis would be unable to make the necessary

contributions, and in order to give the LLC a basis to push Plaintiffs out of the company, requested contribution amounts based on artificially inflated debt-obligations and a fraudulently inflated property valuation. (*Id.* at ¶¶ 32–34.) The LLC debt obligations at issue included a commercial mortgage from Orix Capital Markets and loans made by the Insinger parents to the LLC ("Insinger Family Notes").[1] (*Id.* at ¶ 34.) According to Plaintiffs' Complaint, Mr. Goldmanis believed (and argued) in 2003–2004 that the deficit contributions were unnecessary because there existed "sufficient equity remaining in the Bothell property to meet the debt repayment requirements." (*Id.* at ¶ 35.) Nonetheless, Plaintiffs allege, Defendants fraudulently induced their accountant Theresa Pulliam, a named defendant herein, to "forge documentation indicating no equity remained in the Bothell property." (*Id.*) Subsequently, Plaintiffs allege, the Insinger siblings "withdrew from equity roughly $1,000,000 per child from the property." (*Id.*) Plaintiffs believe that these alleged actions demonstrate the fraudulent nature of the Insinger Defendants' representations regarding the LLC's ability to meet its debt obligations and the valuation of the LLC-held real estate. (*Id.*)

## B.   Procedural History

This lawsuit is but one episode in a long-running series of actions involving the Plaintiffs' divorces and departures from Insinger-24, LLC. In 2004, the LLC sought a declaratory judgment as to the enforceability of the Operating Agreement amendments and deficit contributions in an Idaho state-court lawsuit. Sven Goldmanis counterclaimed and challenged the LLC Operating Agreement amendments. The court in that lawsuit concluded that the amendments were valid and that the deficit contributions were warranted and enforceable against Mr. Goldmanis. (*See* Dkt. No. 21, Ex. C.)

Subsequently, Linda Insinger sued the Insinger Defendants and Sven Goldmanis in a 2007 Idaho state-court lawsuit. She alleged in that action that the Insinger Defendants

---

[1] The "Insinger Notes" also include debt owed to the Virginia C. Hayes Testamentary Trust, which Plaintiffs allege was similarly controlled by the Insinger Defendants following the death of the Insinger parents.

1    manipulated the LLC Operating Agreement in order to squeeze her out of the LLC. (*See* Dkt.

2    No. 21, Ex. A at ¶ 34.) She claimed at that time that she was "damaged by the diminution in the

3    real value of her interest in the LLC and her lost share of the income of the LLC[,]" and alleged

4    that Defendants breached their covenant of good faith and fair dealing when they "squeeze[ed]

5    her out of the LLC."[2] (*Id.* at ¶¶ 42–43.) Ms. Insinger also challenged the "Insinger Notes" in that

6    lawsuit, alleging that the Defendants were requiring the LLC to pay artificially high interest rates

7    on those notes and thus, that they were draining the LLC of money that should have been paid to

8    Ms. Insinger and Mr. Goldmanis. (*Id.* at ¶¶ 14–15, 38.) The parties settled that lawsuit in 2007.

9    Specifically, Ms. Insinger "settled and resolved any and all disputes" related to the Idaho

10   Complaint in November 2007, including claims that were actually asserted, could have been

11   asserted, or "ha[d] arisen or could arise from the operation, management or financial affairs of

12   the LLC[.]" (*Id.*, Ex. G. at 2, 5.) As a part of that agreement, Ms. Insinger also agreed to

13   relinquish all of her rights to any interest in the LLC and that she would have no right to any

14   distribution of profits of the LLC, to participate in the governance of the LLC, to bind the LLC

15   as to third-party obligations, or to any interest or property of the LLC. (*Id.* at 6–7.) Ms. Insinger's

16   2008 marriage dissolution proceeding subsequently incorporated the terms of the 2007

17   settlement; in that proceeding, she re-affirmed the agreement to release her ex-husband of any

18   known or unknown claims related to the claims from the 2007 lawsuit. (*Id.*, Ex. J.)

19        During Mr. Goldmanis' marriage dissolution proceedings in 2007 and 2008, he summed

20   up the alleged scheme by arguing that John Insinger "schemed to dilute any non-Insinger's

21   interest and voting rights in the LLC" and "created loan documents reflecting unnecessary loans

22   at huge double digit interest rates to bleed money from the LLC to the Insinger siblings by

23   utilizing their father's estate." (*Id.*, Ex. F at 4.) Mr. Goldmanis also argued in those proceedings

24

25

26        [2] As Defendants point out, Plaintiffs' Complaint in this lawsuit is nearly identical to a draft Complaint from
     the 2007 Idaho action and contains substantially the same allegations as the actual 2007 Idaho complaint. (*Compare*
     Dkt. No. 10 *and* Dkt. No. 21, Ex. B.)

that the Insinger Defendants wrongfully acquired his interest in the LLC. He stated in a brief filed on May 11, 2007 that  Elizabeth Insinger posted attorney fee awards as foreign judgments in Idaho and foreclosed upon his LLC interest without giving him notice in 2005. (*Id.*, Ex. E at 3.) She allegedly did so by having "her brother's good friend, neighbor, and business associate, Hollis Seim, purchase Sven Goldmanis['] interest in the Insinger LLC" for an artificially low price. (*Id.*) Finally, Mr. Goldmanis asserted in a 2008 sworn declaration that the Insinger Defendants wrongfully benefitted by $500,000.00 each when the LLC refinanced the Bothell property loan. (*Id.*, Ex. F.)

In 2011, Ms. Insinger sued her former attorneys from the 2007 action, alleging that they erroneously advised her to settle the 2007 claims relating to the LLC. As a part of that lawsuit, Rob and John Insinger were deposed in April and May 2013. Plaintiffs now assert that in those depositions, John and/or Robert Insinger testified that the Insinger Defendants improperly withdrew $500,000.00 to $1,000,000.00 in equity per sibling—and that this was the first Plaintiffs learned of such allegedly improper withdrawals. Plaintiffs also believe the depositions to contain admissions that the Defendants purposefully depressed the value of the Bothell real estate in 2007 as part of the scheme to dissociate Linda Insinger and Sven Goldmanis from the LLC before refinancing the loan using the higher real value of the property in 2008.

### C.    This Lawsuit and Plaintiffs' Motion to Disqualify McKay Chadwell

Plaintiff's counsel filed this lawsuit on November 12, 2013. (Dkt. No. 1.) Before the Court could hold a status conference and set a case management schedule, Defendant Theresa Pulliam filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. While that motion was pending, Plaintiff filed a "motion to direct defendant to dismiss [a separately-filed] Idaho case," and the Insinger Defendants filed their own motion for summary judgment on the grounds that Plaintiffs' claims are barred under the applicable statutes of limitations and the doctrine of *res judicata*. Finally, seven months after filing their Complaint and after briefing had been completed for the multiple dispositive motions pending before the Court, Plaintiffs filed a motion

to disqualify the Insinger Defendants' counsel from the law firm McKay Chadwell. The Court

addresses each motion in turn, beginning with Plaintiffs' motion to disqualify.

## II.   DISCUSSION

### A.   Plaintiffs' Motion to Disqualify Defendants' Counsel and Defendants' Motion to Strike

#### i.   Sven Goldmanis' Alleged Conversation with John McKay

Plaintiffs moved to disqualify Defendants' counsel from McKay Chadwell on July 3,

2014. Plaintiffs' attorney, Matthew Johnson, asserts that Sven Goldmanis was referred to and

discussed possible representation in this matter with John McKay, *of counsel* with McKay

Chadwell, "several months" before he decided to obtain his current counsel and file this lawsuit.[3]

According to Plaintiffs' counsel, Mr. Goldmanis disclosed to Mr. McKay "specific facts of the

case, as well as the revelations which had occurred recently that the cash calls used to eject him

had been canceled, as well as the straw-man transfer of his shares[.]" (Dkt. No. 38.) Mr. Johnson

states that he and Mr. Goldmanis were aware of this alleged conflict of interest as early as

December 30, 2013, when McKay Chadwell attorneys appeared on behalf of the Insinger

Defendants in this matter, and informed defense counsel about the potential conflict on January

8, 2014.[4] (*Id.* at 1.)

//

---

[3] The Insinger Defendants are represented by Michael McKay and Thomas Brennan of McKay Chadwell. John McKay, *of counsel* with McKay Chadwell, does not represent the Insinger Defendants. Plaintiffs' disqualification motion relies upon the imputed conflict of interest due to the fact that John McKay is a member of the same law firm as Defendants' attorneys.

[4] Plaintiffs' motion contained no sworn declaration to substantiate its allegations. In Plaintiffs' Reply, however, Mr. Johnson submitted two declarations from Sven Goldmanis—one signed, which was presumably the declaration initially supplied to defense counsel but not filed, and one electronically signed and submitted for the first time with the Reply. The second declaration, which responds to Defendants' opposition, takes a different position as to the timing of the alleged conversation with John McKay. Instead of generally alleging that it occurred "several months" before the lawsuit was filed, Plaintiffs' counsel and Mr. Goldmanis now state that the conversation occurred in the spring of 2013. (*See* Dkt. No. 44-1 at 9.) As explained below, such a change of position is significant in light of Defendants' response filings.

1    In response to the conflict of interest allegations made in January 2014, Defendants'

2    counsel conducted an internal search of McKay Chadwell's records and discussed the possible

3    conflict with John McKay and the attorneys actually representing the Insinger Defendants. (Dkt.

4    No. 42.) When no evidence was found to support the allegation that Sven Goldmanis had either

5    been a McKay Chadwell client or otherwise communicated with John McKay, counsel requested

6    additional information and evidence from Plaintiffs' attorney. (*Id.*) Mr. Johnson never provided

7    additional information or more specific allegations, according to Defendants' attorney Thomas

8    Brennan, beyond stating in a subsequent telephone call that the alleged conversation occurred

9    "two years ago." (*Id.*) Now, in response to the disqualification motion, Defendants' lawyers

10   confirm that McKay Chadwell's internal records demonstrate that Sven Goldmanis has never

11   been a McKay Chadwell client and that they have discovered no records of any call between

12   John McKay and Sven Goldmanis. (*Id.*) They also submitted the sworn declaration of John

13   McKay, in which he states that he does not recall ever having a conversation with Sven

14   Goldmanis and that he "did not and do[es] not possess any information, confidential or

15   otherwise, about this case received from a conversation with Sven Goldmanis." (Dkt. No. 41.)

16   Mr. McKay explains further that he has been working outside of the United States in Palestine

17   since June 2, 2013, and that he has had no prospective client conversations since that time. (Dkt.

18   No. 41.)[5] Finally, Michael McKay, who represents the Insinger Defendants in this matter,

19   submitted a sworn declaration in which he states that he has notes from a May 2011 conversation

20   with Sven Goldmanis about a separate matter, for which McKay Chadwell was not retained.

21   (Dkt. No. 40.) Defense counsel suggests that perhaps it was this conversation that Mr. Goldmanis

22   recalls, instead of the alleged conversation with John McKay, for which no evidence—or

23   specific allegations—have been produced.

24   ────────────────

25       [5] It was after this declaration was provided to the Court that Plaintiff's counsel and Mr. Goldmanis clarified
26   their position and stated that the alleged conversation occurred in the spring of 2013—before Mr. McKay departed
     for his work in Palestine.

ORDER
PAGE - 7

1                **ii.**       **Defendants' Motion to Strike**

2           In a properly filed surreply, Defendants move to strike the supplemental declarations

3 filed by Plaintiffs' counsel in Reply and a portion of the Reply brief itself for failure to comply

4 with this District's applicable page limit. Defendants point out that Plaintiffs' counsel submitted

5 no declaration with the motion to disqualify, and by doing so only in Reply, he has provided new

6 allegations to which Defendants have been unable to respond. Additionally, they note, Plaintiffs'

7 Reply brief exceeds the six-page limit under Local Rule 7.

8           Plaintiffs' counsel may not decline to submit declarations to support his motions and

9 then, in Reply, provide declarations that counter Defendants' argument with new allegations. To

10 the extent the first Reply Declaration contains new allegations not addressed in the initial motion

11 or Defendants' opposition, the motion to strike is granted. Further, the Court takes note that the

12 Supplemental Declaration (Dkt. No. 44-1, Ex. B) is not personally signed by Mr. Goldmanis. As

13 Defendants' point out—for the second time in the course of this lawsuit—only attorneys may

14 electronically sign documents; declarations must be personally signed and submitted under

15 penalty of perjury by witnesses. *See* Local Rules W.D. Wash. CR 11; W.D. Wash. Electronic

16 Filing Procedures for Civil and Criminal Cases (documents requiring a signature by a non-

17 attorney must be personally signed and scanned; attorney must retain original signed copy). The

18 second declaration is accordingly stricken. Finally, the Court grants the motion to strike the

19 portion of Plaintiffs' Reply brief that exceeds six pages. *See* Local Rules W.D. Wash. CR 7(e)(4)

20 (limiting reply brief to six pages).

21               **iii.**      **Plaintiffs' Motion to Disqualify**

22           The Court next addresses the merits of Plaintiffs' motion to disqualify. This Court retains

23 responsibility for controlling the conduct of lawyers practicing before it. *Trone v. Smith,* 621

24 F.2d 994, 999 (9th Cir. 1980). In deciding whether to disqualify counsel, the Court looks to the

25 local rules regulating the conduct of the members of its bar. *Avocent Redmond Corp. v. Rose*

26 *Electronics*, 491 F.Supp.2d 1000, 1003 (W.D. Wash. 2007). Attorneys practicing in the Western

District of Washington must abide by the Rules of Professional Conduct as promulgated and interpreted by the Washington Supreme Court. *See* Local Rules W.D. Wash. CR 83.3(a)(2). The Court notes that "disqualification is a drastic measure and that it must consider the danger of a motion to disqualify opposing counsel as a litigation tactic." *FMC Technologies, Inc. v. Edwards*, 420 F.Supp.2d 1153, 1157 (W.D. Wash. 2006).

Rule 1.18 of Washington's Rules of Professional Conduct, which establishes the duties owed to a prospective client, is the applicable rule here.[6] That rules provides in relevant part:

> (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship is a prospective client.

> (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client or except as provided in paragraph (e).

> (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraphs (d) or (e). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

Wash. RPC 1.18.

Plaintiffs' motion to disqualify is without merit. Even if the Court were to consider the stricken declarations and assume the veracity of Plaintiffs' allegations, they nowhere describe specific information that was disclosed to John McKay that "could be significantly harmful" to Mr. Goldmanis in this matter. *See* Wash. RPC 1.18(c). Plaintiffs' counsel states only that Mr. Goldmanis disclosed "specific facts" to Mr. McKay and discussed this matter with him, but

---

[6] Plaintiffs do not cite Rule 1.18 in their motion, but instead seek disqualification under Rule 1.7. (Dkt. No. 38 at 3.) Rule 1.7 establishes the conflict of interest rules for current clients, not the more limited  duties owed to prospective clients such as Mr. Goldmanis. The Court disregards Plaintiffs' summary argument in Reply that Rule 1.7 applies. Rule 1.18 supplies the appropriate test.

never explains what those specific facts were, why they are not merely the facts already known or made available by the Insinger Defendants, or why they would be significantly harmful to Mr. Goldmanis' interests. To the extent Plaintiffs rely upon the alleged disclosure of the 2013 "revelations" from the depositions of Rob and John Insinger, those depositions do not contain confidential information that could be significantly harmful to Mr. Goldmanis. On the contrary, they are readily available documents that all parties in the action can access. Nor would they be significantly harmful to Mr. Goldmanis, as he expressly seeks to rely on those "revelations" in this lawsuit. Ultimately, alleging generally that one spoke to an attorney about a possible representation without describing what information was actually disclosed, when such conversations occurred, or how the information disclosed could be significantly harmful, is not sufficient to warrant the drastic remedy of disqualification. Rule 1.18 reflects this common sense conclusion by requiring that the lawyer have received information from the prospective client that would be significantly harmful rather than categorically barring the representation of clients with interests adverse to prospective clients.

Finally, the Court takes note of Plaintiffs' delay in moving for disqualification. Under Washington law, the failure to file a motion to disqualify "with reasonable promptness" after a party discovers the basis for an alleged conflict may result in waiver of the objecting party's ability to bring the motion. *Eubanks v. Klickitat Cnty.*, 326 P.3d 796, 798 (Wash. App. 2014); *see In re Firestorm 1991*, 129 Wash.2d 130, 145 (1996) ("Delay in filing [a] motion to disqualify is suggestive of its use for purely tactical purposes and could be the sole ground[] for denying [the motion]."). Here, Plaintiffs' counsel states in the original motion that he was aware of the alleged conflict in late 2013 when McKay Chadwell attorneys appeared in this action, and it is undisputed that he contacted defense counsel about the issue on January 8, 2014. However, he never found any evidence of the alleged conversation and waited six months to move for disqualification. In the course of this six month period, the parties briefed a motion to dismiss, a motion for summary judgment, and Plaintiffs' motion to dismiss a separate Idaho case. Given the

1   six-month delay and the significant motion practice that has already been completed, the Court

2   finds the disqualification motion to be a thinly veiled litigation tactic meant to further delay the

3   result reached below.

4       Accordingly, Plaintiffs' motion to disqualify the Insinger Defendants' counsel is denied.

5   **B.**    **Plaintiffs' Motion to Direct Defendants to Dismiss the Idaho Lawsuit**

6       Plaintiffs also ask the Court to "provide an order directing [the Insinger Defendants] to

7   dismiss [their] action recently opened in Idaho[,]" in which Defendants allegedly seek a ruling

8   that the 2007 settlement between the Insinger Defendants and Ms. Linda Insinger is enforceable.

9   (Dkt. No. 18 at 1.) Plaintiffs assert that they are entitled to such relief under the "first to file"

10   rule; because such a lawsuit is not permitted to be filed in Idaho; and because Mr. John Insinger

11   has allegedly engaged in unethical behavior. (*Id.* a 2–7.) Defendants oppose Plaintiffs request on

12   the grounds that the first-to-file rule does not apply and that the remainder of Plaintiffs'

13   arguments are legally meritless. Upon review, the Court agrees with Defendants and declines to

14   require them to dismiss their Idaho lawsuit.

15       The only legal basis Plaintiffs offer to support their request is the "first-to-file" rule. That

16   rule is a "generally recognized doctrine of federal comity which permits a district court to

17   decline jurisdiction over an action when a complaint involving the same parties and issues has

18   already been filed in another district." *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–

19   95 (9th Cir. 1982). The first-to-file rule may be invoked when the actions at issue are pending in

20   different federal district courts, *see AmerisourceBergen Corp. v. Roden,* 495 F.3d 1143, 1156

21   (9th Cir. 2007), and "[c]ourts have [also] expressed conditional approval of the rule's application

22   where the actions at issue are pending before different judges in the same district court."

23   *Henderson v. JPMorgan Chase Bank,* No. C11–3428, 2011 WL 4056004, at *2 (C.D. Cal.

24   Sept.13, 2011). Here, Plaintiffs offer no authority to demonstrate that the rule applies in

25   situations where two cases are proceeding concurrently in federal and state courts. Even more

26   importantly, Plaintiffs do not actually ask this Court to decline jurisdiction over this lawsuit.

1    Instead, they seek an injunction to prohibit Defendants from pursuing a separate state-court

2    lawsuit. Because the first-to-file rule does not apply under the circumstances and Plaintiffs

3    provide no compelling reason to expand the scope of the rule, the Court declines to do so.

4             To the extent Plaintiffs argue that this Court can enjoin Defendants from proceeding with

5    the Idaho lawsuit under *Kline v. Burke Construction Co.*, 260 U.S. 226 (1922), which the Court

6    construes as a reference to the "in aid of jurisdiction" exception to the Anti-Injunction Act, the

7    Court disagrees. The court in *Kline* held that a district court may appropriately bar prosecution of

8    a state court action "where the effect of [a state court proceeding] would be to defeat or impair

9    the jurisdiction of the federal court." 260 U.S. at 229. The Supreme Court explained, however,

10   that this rule is "limited to action[s] which deal either actually or potentially with specific

11   property or objections." *Id.* ("[W]hen a state court and a court of the United States may each take

12   jurisdiction of a matter, the tribunal whose jurisdiction first attaches holds it, to the exclusion of

13   the other, until its duty is fully performed, and the jurisdiction is exhausted.") In other words, the

14   rule generally does not apply when two cases involve *in personam* jurisdiction rather than *in rem*

15   jurisdiction over specific property. *See Wyly v. Weiss*, 697 F.3d 131, 137–38 (2d Cir. 2012) (the

16   rule applies only to actions *in rem* because the state court's exercise of jurisdiction in that

17   instance "necessarily impairs, and may defeat" the federal court's jurisdiction over the *res*.")

18   (quotation omitted). Here, Plaintiffs utterly fail to take note of this distinction. The lawsuits at

19   hand are traditional *in personam* actions outside the scope of *Kline*'s holding. Plaintiffs'

20   argument is accordingly without merit.

21            The Court has considered the remainder of Plaintiffs' factual contentions, but finds them

22   to be unpersuasive given the lack of any legal basis for this Court to enjoin the Insinger

23   Defendants from proceeding with the Idaho lawsuit. Accordingly, Plaintiffs' motion to direct the

24   Insinger Defendants to dismiss the Idaho lawsuit is denied.

25   //

26   //

ORDER
PAGE - 12

1    **C.    Defendants' Motion for Summary Judgment**

2        The Court next turns to the Insinger Defendants' motion for summary judgment.

3    Defendants move for summary judgment on the grounds that Plaintiffs' claims are barred by the

4    applicable statutes of limitations and precluded under the doctrine of *res judicata*.[7] Because this

5    Court's federal question jurisdiction is premised upon the assertion of a single federal RICO

6    claim,[8] the Court first determines whether that claim is properly before the Court. Because

7    Plaintiffs' RICO claim is untimely and barred as a matter of law, the Court declines to exercise

8    supplemental jurisdiction over Plaintiffs' twenty (20) remaining claims and dismisses them

9    without prejudice. As to Plaintiffs' RICO claim, summary judgment is granted to the Insinger

10   Defendants.

11           **i.    Legal Standard**

12       Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant

13   summary judgment if the movant shows that there is no genuine dispute as to any material fact

14   and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such

15   a determination, the Court must view the facts and inferences to be drawn therefrom in the light

16   most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–50

17   (1986). Once a motion for summary judgment is properly made and supported, the opposing

18   _____

19       [7] Defendants also move to strike the declarations of Plaintiffs Linda Insinger and Sven Goldmanis for
     failure to comply with 28 U.S.C. § 1746. The Court grants the request. The Goldmanis declaration contains no

20   signature whatsoever. The Insinger Declaration is also unsigned, though the Court does note that Ms. Insinger
     appears to have signed a separate declaration attesting to the accuracy of the first. (Plaintiff's counsel also included a

21   signature page from Ms. Insinger that does not match the first declaration, and it is unclear to which declaration the
     "Signature Declaration" refers). Requiring a signature is meant to verify that individuals like Mr. Goldmanis and

22   Ms. Insinger understand "the legal significance of the declarant's statements and the potential for punishment if the
     declarant lies." *U.S. v. Bueno-Vargas*, 383 F.3d 1104, 1111 (9th Cir. 2004). Even if the Court were to consider the

23   Goldmanis and Insinger declarations, however, the unsupported assertions therein would not suffice to create
     genuine issues of material fact where they fly in the face of the documentary evidence.

24       [8] Plaintiffs' Complaint asserts that this Court has both federal question and diversity jurisdiction. (Dkt. No.

25   10.) As to the latter, such an assertion fundamentally misunderstands the meaning of "complete diversity" as
     required under 28 U.S.C. 1332. The Complaint itself alleges that Plaintiffs are residents of California and

26   Washington and that Defendants Elizabeth and Rob Insinger are also residents of Washington and California,
     respectively. In light of Plaintiffs' own allegations, complete diversity is lacking and the Court has no jurisdiction
     under § 1332.

party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate only against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### ii. RICO's Statute of Limitations Bars Plaintiffs' Claim

The statute of limitations for civil RICO claims is four years. *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001). The limitations period "begins to run when a plaintiff knows or should know of the injury that underlies his cause of action." *Id.* at 1109 (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)); *see also Rotella v. Wood,* 528 U.S. 549 (2000) (rejecting accrual rule based on discovery of racketeering pattern). Constructive notice is established if the plaintiff "had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud[,]" and begins to run the statute of limitations regardless of any fiduciary relationship between the injured and the injurer. *Id.* at 1110 (citation and quotation marks omitted). Ultimately, summary judgment is appropriate "if the uncontroverted evidence irrefutably demonstrates" that a plaintiff discovered or should have discovered his injury but failed to file a timely complaint. *See Volk v. Davidson*, 816 F.2d 1406, 1417 (9th Cir. 1987).

The gist of Plaintiffs' case and the injury they allege to support their RICO claim is that they were unlawfully pushed out of Insinger-24, LLC through a fraudulent scheme and unfairly deprived of their interest in the LLC and the Bothell Property. (Dkt. No. 10 at ¶ 29.) Actions allegedly taken to dissociate Plaintiffs from the LLC include: (1) Defendants unfairly tricking Linda Insinger into voting, along with the sibling Defendants, to amend the LLC Operating

1   Agreement so as to require deficit contributions from LLC members (*Id.* at ¶ 32); and (2)

2   Defendants artificially increasing the LLC's debt obligations through their control of the Insinger

3   Notes and false valuation of the Property in order to provide a fraudulent basis for requiring the

4   LLC members to make deficit contributions (*Id.* at ¶¶ 34, 36, 37). The actions allegedly taken by

5   Defendants to further the dissociation scheme occurred roughly ten years ago in 2003 or 2004.

6   Plaintiffs also point to alleged efforts to cover up the scheme, which include allegedly false

7   statements made during litigation occurring in 2007 and 2008.

8           Plaintiffs' RICO claim is barred because the uncontroverted evidence demonstrates that

9   Mr. Goldmanis and Ms. Insinger knew of the very injuries they now allege between 2004 and

10  2008—indeed, they have previously leveled the same or substantially similar allegations against

11  the same defendants in various other proceedings. In 2004, for example, Mr. Goldmanis

12  challenged the Operating Agreement amendments. The court upheld the amendments and deficit

13  contributions as enforceable. Then, in 2007, Ms. Insinger brought a lawsuit against the

14  defendants here (as well as Mr. Goldmanis) alleging nearly identical claims to this lawsuit.

15  There, Ms. Insinger alleged that she was "damaged by the diminution in the real value of her

16  interest in the LLC and her lost share of the income of the LLC." (Dkt. No. 21, Ex. A at ¶ 43.)

17  The parties ultimately settled that lawsuit, and Ms. Insinger expressly agreed to relinquish any

18  right she had in the LLC and to release Defendants from any and all claims relating to the LLC

19  or its members' conduct. Then, in his marriage dissolution proceeding, Mr. Goldmanis argued

20  that (i) the Insinger Defendants wrongfully benefitted by $500,000 each (in equity withdrawals)

21  when the LLC refinanced the Bothell Property loan and (ii) that he was improperly pushed out of

22  the LLC when Elizabeth Insinger foreclosed upon his LLC interest and had Hollis Seim purchase

23  his interest for an artificially low price. (*Id.*, Ex. D at ¶ 5; Ex. E at 8; Ex. F.) Ms. Insinger again

24  addressed the loss of her interest in the LLC in her 2008 marriage dissolution proceeding, which

25  incorporated the 2007 settlement agreement. Finally, Defendants point out that Ms. Insinger's

26  2007 tax documents indicate that she had transferred her interest in the LLC. (*Id.*, Ex. K at ¶ 12;

1    *see also* Dkt. No. 30-3, Ex. I.)

2         At each step between 2004 and 2008, then, Mr. Goldmanis and Ms. Insinger were clearly

3    aware of the injuries they now allege as a basis for their RICO claim, namely, that they were

4    pushed out of the LLC without fair compensation or otherwise suffered financial harm as a result

5    of Defendants' alleged actions from 2003 onwards.[9] At the latest, Plaintiffs should have filed

6    their RICO claim by 2011, four years after Ms. Insinger's Idaho complaint was filed and

7    ultimately settled.

8         Plaintiffs' own statements support this conclusion. Plaintiffs mention the fact that they

9    were "departed of their rights of the Bothell Property [*sic*]," while asserting that such injuries

10   were not discovered until 2013. (Dkt. No. 30 at 17.) They also point to alleged injuries which

11   have not been pleaded, such as a "fraudulent filing of K-1s[,]" and point to injuries of "ROB's

12   forgeries" which were "unknown until they were provided in 2013." (*Id.*) Finally, Plaintiffs

13   explain that Defendants' "misrepresentations regarding assets of the LLC, value of the Bothell

14   Property, and payment of the Cash Calls . . . was not discovered" until 2013. (*Id.*) Each of these

15   statements, to the extent the Court understands them, relate to the alleged misrepresentations

16   involved in the dissociation scheme. The problem for Plaintiffs is that they had knowledge of

17   their own injuries—that they were pushed out of the LLC and deprived of their interests—at

18   least as early as 2007, and nothing as argued by Plaintiffs' counsel disputes that fact.

19   //

20   _____

21        [9] To the extent Plaintiffs assert that the loss of their LLC interests and the accompanying financial harm
22   were "completely unknown" and "not discovered" until 2013, the Court finds such statements to be incredible. Such
     statements are unsupported by any actual evidence and fly in the face of the very pleadings these Plaintiffs have
23   made in previous lawsuits. For the same reason, the Court rejects the argument of Plaintiffs' counsel that John and
     Robert Insinger "boastfully – and believing themselves safe – declared that everything they had done was in fact
24   untrue and that they had indeed pulled one over on SVEN, LINDA, and the court system." (Dkt. No. 30 at 7.) While
     Plaintiffs' counsel repeats similar statements in the course of his briefing, he cites no actual deposition testimony in
25   which such admissions were made. Instead, he cites only to the self-serving testimony of Ms. Insinger's declaration.
     Given that the deposition transcripts were in fact provided to the Court and no such admissions are apparent, the
26   Court declines to accept such attorney argument as creating a genuine issue of fact as to when Plaintiffs learned of
     their injuries.

iii.     **Plaintiffs Are Not Entitled to Equitable Tolling**

Perhaps recognizing the untimely nature of their RICO claim, Plaintiffs' focus their briefing on reasons the Court should toll the four-year statute of limitations. They confusingly argue that the limitations period should be equitably tolled because "defendants provided false information and documentation during at least two litigations to show that the Insinger Family Notes were proper and that the LLC had insufficient assets to meet those notes"; that Defendants "concealed this activity using Theresa Pulliam to provide fraudulent tax reporting and money laundering"; and that this activity prevented Plaintiffs from raising any claims. (*See* Dkt. No. 30 at 18.) Plaintiffs also state in a conclusory fashion that they did not know of their alleged injuries despite their "due diligence to attempt to find this conduct." (*Id.*)

The Ninth Circuit has recognized that "[e]quitable tolling doctrines, such as fraudulent concealment, apply in civil RICO cases." *Pincay*, 238 F.3d at 1110. But equitable tolling based on fraudulent concealment is "properly invoked only if a plaintiff establishes affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Id.* (citation omitted). Ultimately, equitable tolling requires the plaintiff to show that (i) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (ii) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (iii) the plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled. *Rotella v. Wood*, 528 U.S. 549, 561 (2000).

Plaintiffs' request for equitable tolling lacks merit. For the reasons explained above, Plaintiffs were unquestionably aware of their alleged injuries no later than 2007, when Linda Insinger sued the Defendants herein and Sven Goldmanis based on the same dissociation scheme. Their assertion that "the foreclosure (SVEN) and settlement release (LINDA) were completely unknown" until 2013 is flatly contradicted by the record: Linda agreed to and signed the 2007 settlement agreement relinquishing her interest in the LLC; Mr. Goldmanis appeared in

1   the 2007 lawsuit; and Mr. Goldmanis argued in his previous 2008 marriage dissolution

2   proceeding that his interest in the LLC was unlawfully foreclosed upon in 2005. (*See* Dkt. No.

3   21, Ex. G, E.) The alleged misrepresentations made in the previous litigations were at most

4   attempts to avoid liability for the injuries now asserted, not new injuries suffered by Plaintiffs.

5   And to the extent Plaintiffs' argument is based on the fact that they "pleaded that defendants

6   provided false information and documentation during at least two litigations[,]" the Court is not

7   persuaded. At the summary judgment stage, Plaintiffs may not rely merely on their pleadings,

8   but must offer evidence to support their claims. They have not done so.

9       Because Plaintiffs' federal RICO claim was not timely filed, it is barred as a matter of

10   law. The Court accordingly grants summary judgment to the moving Defendants on this claim

11   and declines to exercise supplemental jurisdiction over Plaintiffs' twenty (20) remaining claims.

12   *See* 28 U.S.C. § 1367(c) (district court may decline to exercise supplemental jurisdiction where it

13   has dismissed all claims over which it has original jurisdiction); *Acri v. Varian Assocs., Inc.,* 114

14   F.3d 999, 1001 n.3 (9th Cir. 1997) (en banc) (explaining that a district court may decide *sua*

15   *sponte* to decline to exercise supplemental jurisdiction). Because the Court declines to exercise

16   jurisdiction over Plaintiffs' state law claims, it does not reach Defendant Theresa Pulliam's

17   motion to dismiss. Instead, the Court denies that motion as moot.

18   **III.   <u>CONCLUSION</u>**

19       For the foregoing reasons, Plaintiffs' motion disqualify Defendants' counsel (Dkt. No.

20   38) is DENIED, Plaintiff's motion to direct Defendants to Dismiss Idaho Case (Dkt. No. 18) is

21   DENIED, the Insinger Defendants' motion for summary judgment (Dkt. No. 20) is GRANTED

22   IN PART, and Defendant Theresa Pulliam's motion to dismiss Plaintiff's complaint pursuant to

23   Rule 12(b)(6) (Dkt. No. 13) is DENIED as moot. Because the Court concludes that Plaintiffs'

24   sole federal RICO claim is barred as a matter of law, the Court DECLINES to exercise

25   supplemental jurisdiction over their remaining state law claims and DISMISSES those claims

26   without prejudice.

1    DATED this 29th day of July 2014.

2

3

4

5

6

7

8

                                            John C. Coughenour
                                            UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER
PAGE - 19